**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **STATE OF MARYLAND,** | * | |
| **DEPARTMENT OF THE** | * | |
| **ENVIRONMENT,** | * | |
| | * | |
| Plaintiff | * | Civil Nos.  **PJM 10-0826** |
| v. | * | **PJM 11-1209** |
| | * | **PJM 12-3755** |
| **GENON ASH MANAGEMENT, LLC,** | * | |
| **et al.,** | * | |
| | * | |
| Defendants. | * | |

**MEMORANDUM OPINION**

The State of Maryland Department of the Environment ("MDE") filed three separate

complaints against GenOn Maryland Ash Management, LLC, GenOn Mid-Atlantic, LLC, and

their predecessor companies, Mirant Maryland Ash Management, LLC and Mirant Mid-Atlantic,

LLC (collectively "GenOn"), alleging violations of the federal Clean Water Act, 33 U.S.C. §

1311, as well as violations of Md. Code Ann., Envir. §§ 9-322 and 9-323 (unauthorized

discharge of pollutants to state surface waters and groundwaters).  The alleged violations

occurred at three sites where GenOn operates facilities that dispose of coal combustion

byproducts in landfills: the Brandywine Ash Management Facility (Case No. 10-0826), the

Faulkner Ash Management Facility (Case No. 11-1209), and the Westland Ash Management

Facility (Case No. 12-3755).  In the Brandywine case, a group of environmental organizations,

Sierra Club, EarthReports, Inc. d/b/a/ Patuxent Riverkeeper, and Chesapeake Climate Action

Network (collectively "Intervenors") intervened.  In the Faulkner case, Potomac Riverkeeper,

Inc. ("Amicus") appeared as amicus curiae.  MDE and GenOn reached a settlement and moved

for entry of a consent decree resolving all cases.  Intervenors and Amicus partially opposed the

settlement.  The Court received briefs from the parties, Intervenors, and Amicus, and held a

hearing on March 19, 2013.  Following the hearing, the parties submitted a revised proposed

consent decree on April 23, 2013.  The Court signed the revised consent decree on May 1, 2013

(see, *e.g.,* Dkt. 28 in Case No. 11-1209).  This Opinion explains the basis of the Court's approval

of the revised consent decree.

## I. Legal Standard

In considering whether to enter a proposed consent decree, the court is guided by the

overarching principle that settlements are to be encouraged.  *U.S. v. North Carolina,* 180 F.3d

574, 581 (4th Cir. 1999).  Moreover, when a settlement has been negotiated by a specially

equipped agency, the presumption in favor of settlement is particularly strong.  *See U.S. v. City*

*of Welch, W. Va.,* Civ. No. 1:11-00647, 2012 WL 385489, at *2 (S.D. W. Va. Feb. 6, 2012)

(noting presumption in favor of settlement for federal administrative agencies specially oriented

in the field).  A settlement hearing, it may be noted, is not a trial or a trial rehearsal and the court

need not "reach any dispositive conclusions" about "admittedly unsettled legal issues" in the

case.  *Flinn v. FMC Corp.,* 528 F.2d 1168, 1172-73 (4th Cir. 1975) (citations omitted).

Nonetheless, the court is not expected to give mere boilerplate approval of the proposed decree,

without consideration of the facts or analysis of the law, and leave to be heard should be

extended to anyone objecting to it.  *Flinn,* 528 F.2d at 1172-73.

The basic standard is this:

The court must satisfy itself that the consent decree "is fair, adequate, and reasonable"

and "is not illegal, a production of collusion, or against the public interest."  *North Carolina,* 180

F.3d at 581 (citations omitted).  In considering the fairness and adequacy of the proposed decree,

the court must assess the strength of the plaintiff's case.  *See North Carolina,* 180 F.3d at 581

(citing *Flinn,* 528 F.2d at 1172-73).  The court considers the extent of discovery, the stage of the

proceedings, the want of collusion and the experience of plaintiff's counsel who negotiated the settlement. *North Carolina,* 180 F.3d at 581; *Carson v. American Brands, Inc.,* 606 F.2d 420, 430 (4th Cir. 1979); *Flinn,* 528 F.2d at 1173. The opinion of competent counsel, absent any showing of collusion or bad faith, is to be afforded great weight. *Carson,* 606 F.2d at 430. The court also considers the views of those who would be affected by the settlement and the extent of participation of opponents of the plan in terms of the development of the settlement. *See Flinn,* 528 F.2d at 1173.

In order to reach an informed, just and reasoned decision regarding a consent decree, the court reviews testimony at the hearing and other evidence in the record, and considers the above factors in an oral or written opinion. *See Flinn,* 528 F.2d at 1175.

## II.    Background

### A.  History

Brandywine, Faulkner, and Westland are coal combustion byproducts disposal facilities. These disposal facilities contain active and closed disposal areas for combustion byproducts, including fly ash pits. When liquid such as rain water passes through the disposal areas, it can then flow out as leachate containing pollutants, and enter nearby surface and groundwater. Concerns about water pollution at these sites date back at least 15 years.

In 2007, MDE and GenOn began to address pollution at these three sites. Intervenors, or some of them, filed a notice of intent to sue for alleged Faulkner violations. MDE filed an action as to Faulkner in state court. Then, Intervenors, or some of them, filed notice to sue regarding Brandywine. MDE subsequently withdrew its state court case against Faulkner and re-filed in this Court (Case No. 10-0826). GenOn's counterclaims remained pending in state court. Following this Court's denial of Defendants' Motion to Dismiss, discovery materials were

exchanged and depositions were taken. In mid-2011, MDE filed the Brandywine case (11-1209).

Shortly thereafter a stay was entered in both cases and 18 months of settlement discussions

ensued. In late 2012, MDE filed the Westland case (12-3755). The motions to enter the initial

proposed consent decree were filed in all the actions in late 2012 and early 2013.

All the Complaints alleged that GenOn discharged pollutants into state and federal

waterways because it did not properly capture leachate. According to MDE, GenOn possessed

state and federal permits for the outfalls, but the discharges from the sites exceeded the ambient

water quality standards for certain pollutants.

Settlement discussions were protracted. MDE has asserted that during the discovery and

settlement negotiations, the strength of its case was apparent to all. On the other hand, MDE's

counsel stated that there was quite a bit of haggling, and that both parties fought very hard for 18

months. GenOn asserted that much of the discussion was about the proposed penalty, since

GenOn was not disputing that there had been pollution, but, rather, took issue with MDE dealing

with them from an "enforcement" standpoint. (Hr'g Tr. 36-37.) It had been GenOn's belief that

the pollution was nothing other than the result of complying with previous settlement

agreements, and did not amount to a legal violation. Throughout the settlement process,

Intervenors were briefed on a regular basis, working with technical experts and making

substantive comments with respect to MDE's negotiation with GenOn.

### B. Initial Proposed Consent Decree

The initial proposed consent decree required that GenOn pay a civil penalty of $1.9

million within 30 days of the effective date of the decree. Furthermore, GenOn agreed to

undertake a variety of investigatory and remedial activities at the three sites to monitor and limit

the leaching of coal combustion byproducts into the nearby surface waters and groundwaters.

These actions included GenOn installing or upgrading liner systems at disposal sites, monitoring

nearby drinking water wells, conducting a contamination study to prevent future contamination,

and submitting site operation and engineering plans for all three sites to MDE.  The initial

proposed consent decree also included penalty provisions for GenOn's failure to comply with the

stipulated investigatory and remedial activities.

According to MDE's counsel, the initial proposed consent decree "[a]chieved,

essentially, all of MDE's goals."  (Hr'g Tr. 14.)  The United States Department of Justice stated

it had no objection to the settlement.  And, though they remained in partial opposition, both

Intervenors and Amicus stated that they viewed the consent decree as a significant step towards

remediation.

### C.  Objections to Initial Proposed Consent Decree

### 1.  Brandywine

Intervenors expressed one major concern in their briefing and at oral argument: that the

consent decree did not prohibit or even address future developments at Brandywine, and thus did

not have adequate safeguards or a guarantee of public process for any future expansions.  They

argued that a consent decree must further the objectives of the law upon which it is based. *See*

*Local No. 93, Int'l Assoc. of Firefighters, AFL-CIO CLC v. City of Cleveland,* 478 U.S. 501, 525

(1986)). Here, they said, that law is the Clean Water Act, and a consent decree that allowed for

potential future violations would frustrate the purpose of the Clean Water Act.  Thus, Intervenors

argued the consent decree was unreasonable and against the public interest.

Intervenors were also concerned that the decree did not provide that the public would

have an opportunity to comment on or seek judicial review with respect to any future expansions

of the sites, since the proposed decree mandated future discussions between MDE and GenOn

only. Intervenors explicitly stated that, while they did not believe that there was any collusion between MDE and GenOn, they had concerns over MDE's limited resources as compared to the likely ability of directly-affected citizens to mobilize more quickly. In their briefs and at the hearing, MDE and GenOn opposed language about future sites, asserting that this was outside the scope of the Clean Water Act, and that Intervenors were essentially asking the Court to rule on hypothetical future events. That said, at the hearing, MDE and GenOn expressed no objection to at least requiring MDE to give notice to Intervenors of future actions and communications regarding the sites.

### 2. Faulkner

Amicus expressed similar concerns regarding future sites at Faulkner. Additionally, Amicus took issue with specific aspects of the initial proposed consent decree that they maintained rendered the decree ambiguous. The challenged provisions concerned: 1) Paragraph 60, which stated that the schedule for nature and extent studies was to be found at Appendix B, whereas Appendix B only listed schedules for Brandywine and Westland, and had no schedule for Faulkner; and 2) Paragraph 57, which was ambiguous as to when the public should be notified of negative water quality sampling results and when clean drinking water would have to be provided to nearby residents.

As to the schedules, GenOn affirmed that Faulkner would be on same schedule as the other sites, since the schedules were the same, with only the number of wells at each site differing. GenOn therefore agreed to clarify and confirm this in the final decree.

Regarding Paragraph 57, GenOn agreed to change the language that allowed for "prompt" or "30 day" notification to notification "within 10 days." GenOn asserted that whether drinking water should be provided to the public was a decision best left to MDE's discretion,

noting that often elevated levels of certain compounds, such as sulfates in water, do not present health hazards even if they show up negatively in esthetic tests.

### III.  The Current Consent Decree

#### A. Revised Proposed Consent Decree

The revised proposed consent decree is largely the same as the original proposed decree. It contains the same penalties and the same general remediation.  There are, however, some significant additions.  First, the revised decree contains the changes MDE and GenOn agreed to at the hearing regarding Faulkner (clarifying that the Faulkner schedule is the same schedule as the other sites and providing notice with respect to negative water quality sampling results within 10 days).  Second, and importantly, the revised decree provides Intervenors and Amicus with notice and the opportunity to comment with respect to future activities at these sites.  Paragraphs 102-106 of the revised decree clarify that plans and schedules, approvals, and written requests or applications for construction of new disposal cells or other expansion at the sites will be provided by MDE to Intervenors and Amicus, such that there may be an opportunity for Intervenors and Amicus to comment.  In addition, any proposed modifications of the consent decree will also be sent to Intervenors and Amicus.

The United States, through counsel, has indicated that it does not object to the revised proposed consent decree, and Intervenors and Amicus have indicated they will not be filing further oppositions.

For these reasons the Court approved and signed the revised consent decree on May 1, 2013.

## B. The Revised Proposed Consent Decree Is Fair, Adequate and Reasonable and in the Public Interest

In so doing, the Court found the Consent Decree fair, adequate and reasonable and in the public interest. It is not illegal or the product of collusion. *See North Carolina,* 180 F.3d at 581.

The settlement is fair. It was negotiated by MDE, a state agency specially equipped to work on environmental law matters. Moreover, MDE's counsel—present and past—were and are very experienced in environmental law. Stephen Johnson, Esquire, who represented MDE at the hearing, has been principal counsel at MDE for five years, and has practiced environmental law (including Clean Water Act law) for 20 years in both state and federal courts. Richard Waddington, Esquire, a former MDE attorney who was actively involved in settlement discussions, has had more than 20 years of environmental practice experience and was the environmental practice leader at his law firm before joining MDE. Negotiations took place over 18 months, and included the sharing of records and depositions. There have been no allegations of collusion; indeed, those affected by and opposing the initial proposed consent decree, Intervenors and Amicus, acknowledged that they had a full opportunity to make comments and review the decree throughout the process. Further, all parties have had an opportunity to be heard before the Court. *See Flinn,* 528 F.2d at 1173.

The settlement is also adequate and reasonable. Competent counsel have stated that the settlement achieves essentially all of MDE's goals. MDE's case here indeed was strong, but at the same time, GenOn vigorously contested that its actions merited a penalty. The $1.9 million penalty agreed upon, however, is reasonable, particularly insofar as it includes separate remedial requirements and additional penalties if those requirements are not met. *See City of Welch,* 2012 WL 385489, at *2 (finding consent decree adequate and reasonable and noting fine penalty as well as separate remedial requirements). Moreover, the settlement agreement closes three

pending federal law suits, as well as a counterclaim pending in the Circuit Court for Charles County relating to the Faulkner site, thus resolving four separate litigations.

Lastly, the settlement is in the public interest. It represents a significant step toward remediating pollution at these sites. In addition, it is in the public interest because it provides for notice to the public of future activities at the sites. Notice allows for an opportunity for the public to be heard, particularly those who may be immediately affected by developments at the sites. Notice will go a long way towards ensuring that the public interest is not harmed in the future.

For all these reasons, a separate Order approving the revised Consent Decree has been **ENTERED.**


                                              _____/s/_____
                                              **PETER J. MESSITTE**
**June 10, 2012**                             **UNITED STATES DISTRICT JUDGE**


9